IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JACOB W. CLENDENIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 14-cv-913-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. §405(g), plaintiff Jacob Clendenin is before the Court, represented by counsel, seeking judicial review of the final agency decision denying him Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. §423.

**Procedural History**

Plaintiff initially applied for benefits in June 2011, alleging disability beginning on April 10, 2005. (Tr. 20). The claim proceeded to a hearing before ALJ Stuart T. Janney, who issued an unfavorable decision on April 17, 2013. (Tr. 20-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this court.

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 20.

1

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ failed to fully develop the record and properly assess plaintiff's credibility.

2. The ALJ did not appropriately evaluate plaintiff's headaches.

3. The ALJ improperly created an evidentiary deficit by rejecting all medical opinions of record.

4. The ALJ improperly rejected Dr. Freeman's opinion.

**Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

2

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment,

determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).** See also, **Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled… If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)(citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))**.

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into

consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since his application date. The ALJ found that plaintiff had severe impairments of Chiari malformation, syringomyelia, level three obesity, and headaches. The ALJ further determined that these impairments did not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light level with physical limitations. Based on the testimony of a vocational expert (VE) the ALJ found that plaintiff could perform jobs which existed in significant numbers in the national and local economy. (Tr. 20-28).

### The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

1. **Agency Forms**

Plaintiff was born in 1990 and was fifteen years old at his alleged onset date. (Tr. 141). He was five feet ten inches tall and weighed three hundred and ten pounds. (Tr. 145). He completed three years of college in 2010 but had no previous work experience. (Tr. 145-46).

Plaintiff claimed Chiarai malformation, syringomyelia, chronic headaches, numbness in his feet, severe back pain, back and shoulder spasms, chronic insomnia, dizziness, and vertigo made him unable to work. (Tr. 145). Plaintiff took Flexeril for his back spasms, and Neurontin, Ultram, and Vicodin for pain. (Tr. 148).

In August 2011, plaintiff submitted a function report. (Tr. 152-62). He lived in an apartment with family members. He stated that the syringomyelia and Chiari malformation caused insomnia, migraines, chronic pain, inability to focus, back spasms, depression, and limited his ability to walk, stand, or sit. (Tr. 152). Plaintiff read, listened to music, watched television, or built and painted miniature models for most of the day. (Tr. 153, 156).

Plaintiff could spend fifteen to thirty minutes cooking simple meals. Cooking meals for his family was one of the few things he said he could do without experiencing pain. He also occasionally helped his grandmother with the dishes. (Tr. 154). He was able to drive but rarely shopped for food and other necessities. (Tr. 155).

Plaintiff claimed to have problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, concentrating, and using

his hands. He was able to walk for about thirty minutes before needing a fifteen minute break. (Tr. 157).

**2. Evidentiary Hearing**

Plaintiff was represented by counsel at the evidentiary hearing held on March 12, 2013. (Tr. 35). At the time of the hearing, plaintiff was twenty-three years old, five feet eleven inches tall, and weighed close to three hundred pounds. (Tr. 38-40). He previously had a driver's license but he let it expire because he did not drive frequently. (Tr. 40).

Due to his disabilities, plaintiff was in a home bound program in high school and received his GED. (Tr. 39-40). He earned his associate degree in psychology two years prior to the hearing. (Tr. 38). It took plaintiff three years to complete the associate degree program and he received special assistance to accommodate for days he could not attend class. (Tr. 39).

Plaintiff testified that his "cluster headaches" and severe back, shoulder, and neck pain were the primary medical problems that kept him from being able to work. (Tr. 41-42). Plaintiff had "cluster headaches" about twice a month that he considered "violent" and would last for several hours. (Tr. 42). He would need several days to recover after experiencing a cluster headache. (Tr. 43). He had smaller headaches every day and to relieve the pain he would lie down in a dark room for a few hours. (Tr. 42).

Plaintiff took Neurontin and Vicodin which helped manage the pain but did not nullify it completely. (Tr. 43). Plaintiff testified that his medications caused weight gain, drowsiness, balance issues, changes in vision, and numbness in

7

his feet. (Tr. 45). He had a TENS machine for his back spasms but it did not help so he did not use it. (Tr. 48-49). Plaintiff's neurosurgeon did not recommend surgery because his conditions were not progressing to a level severe enough to endure the risks of surgery. (Tr. 42).

Plaintiff did not have health insurance or a medical card. His doctor at Midwestern Health Service provided services pro bono. (Tr. 41). His grandmother paid out of pocket for his medications. He was unable to go to the emergency room due to his family's financial situation so when his headaches were bad he had to just let them pass. (Tr. 43).

Plaintiff's back, neck, and shoulder pain increased when he performed any activity for too long. (Tr. 44-45). He testified that he would lie down or take a shower to alleviate the pain. (Tr. 45). When he did not have a headache he was able to help with the dishes but could not do them by himself because he could not stand for long periods of time. (Tr. 46). Plaintiff and his fiancé would occasionally go to the movies but they usually stayed home. (Tr. 47). He stated he could be on his feet for a maximum of twenty minutes before needing to rest. He could sit for thirty to forty minutes before experiencing pain. Lifting anything over the weight of a gallon of milk was difficult and caused problems with his shoulders. (Tr. 48). Plaintiff was rarely able to sleep for a full night and as a result he had trouble concentrating. (Tr. 49).

A vocational expert (VE) also testified. (Tr. 51-57). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age, work history, and educational background

8

that was able to perform light work but could never climb ladders, ropes, or scaffolding. Additionally, the individual could only occasionally reach overhead with the bilateral upper extremities and needed to avoid concentrated exposure to common hazards such as moving machinery that is used to cut or to grind, unprotected heights, or the operation of commercial motor vehicle equipment. The person would also need to avoid concentrated exposure to vibration, fumes, odors, dust, and gas, must work in an environment with a moderate noise intensity level, and could not work in direct sunlight. (Tr. 52-53).

The VE testified that the person could perform work that existed in significant numbers in the national economy. Examples of such jobs were inspector, sorter, and bench type assembler. (Tr. 53). The VE stated that if the person had off task behavior up to fifteen percent of the workday due to headaches all work would be precluded. (Tr. 55).

### 3. Medical Evidence

Plaintiff's medical history on record begins in 2007 with his primary care physician, Dr. Jodi Fox. (Tr. 246-47). He saw Dr. Fox seven more times through 2012. (Tr. 219, 221, 223, 225, 227, 246, 274). He consistently complained of headaches, low back pain, neck pain, thoracic pain, blurred vision, paresthesia, and pain in his shoulders. *Ibid.* Plaintiff was diagnosed with type I Chiari malformation and thoracic syrinx or syringomyelia. *Ibid.*

In 2008 and 2012, Plaintiff saw neurosurgeon, Dr. Sonjay Fonn, for his headaches, back pain, and occasional numbness in his shoulder. (Tr. 230-33, 281-83). He reviewed plaintiff's MRIs and noted his Chiari malformation and

syrinx were unchanged from 2008 through 2012. (Tr. 281). He stated that he would not recommend any surgical intervention for plaintiff's thoracic syrinx. (Tr. 230, 283).

### 4. Reviewing Physician Opinion

In March 2013, neurologist Dr. Julian Freeman performed a records review at the request of plaintiff's attorney. (Tr. 211-14). Dr. Freeman's diagnoses were Chiari malformation at the base of the brain and upper cervical spine, thoracic cord syringomyelia, morbid obesity, and cluster headaches that may actually be migraine headaches. (Tr. 212). Dr. Freeman opined that plaintiff's thoracic syrinx would have several immediate and consequential limitations. He stated that plaintiff would have intense pain that would be difficult to suppress and would require very frequent changes in posture. The thoracic syrinx would also disrupt sleep and would cause a marked impairment in higher cognitive thought, slow responses, and instability of mood and personality. (Tr. 213).

Dr. Freeman stated that plaintiff's headaches would also impose functional limitations. Dr. Freeman opined that the headaches were independent of the syrinx or the Chiari malformation and most likely stemmed from a motor vehicle accident. Dr. Freeman stated migraines would cause impairments of speech, memory, and cognitive function, and the cluster headaches would cause pain and personality changes. (Tr. 213).

Dr. Freeman's RFC assessment was that plaintiff could walk and stand for about two hours and sit for about six hours with incessant shifts in posture and position during a typical work day. Additionally, plaintiff could lift, carry,

push, or pull about twenty pounds occasionally and ten pounds frequently with minimal overhead reach. (Tr. 213). Plaintiff would need postural changes of all types with no substantial twisting motion of the spine, and no exposure to more than minimal levels of vibration. (Tr. 213-14). Dr. Freeman stated that plaintiff would have prolonged interruption of all work activities at least once a week for several hours due to his headaches. Plaintiff's mental activities should be limited to simple tasks with limited memory and pace of mental or physical activities due to his sleep deprivation. Dr. Freeman noted that plaintiff would have imprecise and slow spatial organization and arrangement of work objects, tools, and work tasks. (Tr. 214).

**5. Consultative Examination**

In August 2011, plaintiff had a physical consultative examination with Dr. Adrian Feinerman. (Tr. 253-58). He noted that plaintiff was able to ambulate fifty feet without assistance and had normal muscle strength throughout. (Tr. 256). Plaintiff's fine and gross manipulation were normal and he was oriented to person, place and time. (Tr. 256-57). His diagnostic impressions were Chiari malformation of the brain and syringomyelia. (Tr. 257).

**6. RFC Assessment**

In September 2011, state agency physician Lenore Gonzalez completed an assessment of plaintiff's physical RFC capabilities. (Tr. 264-70). He reviewed plaintiff's records but did not examine plaintiff. He felt plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk, and sit for about six hours in an eight hour workday. (Tr. 264). Dr.

Gonzalez opined that due to plaintiff's history of vertigo, he should only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and avoid hazards such as machinery and heights. (Tr. 265-67).

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's credibility findings. ALJ Janney found plaintiff not credible due to his infrequent treatment history, work history, routine examinations, daily activities, and ability to complete his degree.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." **Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings. **Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. **Ibid**. See also, **Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain

Case 3:14-cv-00913-CJP Document 29 Filed 06/19/15 Page 13 of 19 Page ID #386

those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

Plaintiff takes issue with the ALJ's usage of boilerplate language that has been criticized in cases such as ***Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010)**, and ***Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2003).** However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. **See, *Pepper v, Colvin*, 712 F.3d 351, 367-368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 310-311 (7th Cir 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3. While ALJ Janney considered several of these factors his analysis is legally insufficient.

Plaintiff argues that the ALJ incorrectly considered plaintiff's daily activities in forming his credibility determination. The Seventh Circuit has repeatedly held it is appropriate to consider daily activities but it should be done with caution. ***Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).** The ALJ noted that plaintiff played his guitar for twenty minutes at a time, he sometimes helped his grandmother do the dishes, he could build a model for an hour, he read while sitting or lying down, and he occasionally cooked and

spent time with his fiancé. (Tr. 25). The ALJ stated that plaintiff's ability to cook or build models required him to be around fumes, playing the guitar required him to be around noise, and going to movies and reading required visual focus. The ALJ stated that these factors usually exacerbate headache pain, and plaintiff's ability to "tolerate" the exposure to these factors does not preclude him from being exposed to similar factors at work. (Tr. 27).

However, the ALJ failed to consider that plaintiff could choose to perform these daily activities when he did not have a headache or was not experiencing symptoms. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." **Roddy, 705 F.3d at 639.** Plaintiff's daily activities can all be done with significant limitations and do not indicate he can complete an entire workday or workweek. The ALJ's reliance on his daily activities without further explanation is inadequate.

The ALJ stated that plaintiff's ability to complete his associate degree was an indication that his symptoms were not as serious as he alleged and that he could maintain concentration. The ALJ also noted that plaintiff "did not present evidence" that he received significant accommodation in obtaining his degree. However, at the beginning of plaintiff's evidentiary hearing, plaintiff's attorney offered to provide school records indicating plaintiff needed specialized accommodations. (Tr. 36-37). The ALJ stated they would determine if that was necessary at the end of the hearing. (Tr. 37). Plaintiff testified that he was enrolled in a program for his associate degree that allowed disabled students to attend college. He was given notes for days he could not attend and was

14

allowed to stand or lay down at school as needed. (Tr. 39). When the hearing concluded, the ALJ stated, "[a]s for the school records, I think we've addressed that through testimony so that's been hashed out." (Tr. 57). As a result, plaintiff did not provide records of the specialized accommodations. The ALJ indicated plaintiff did not need to more fully develop the record and then used the undeveloped record against him. This is error.

ALJ Janney also stated that plaintiff's allegations of pain were not credible because he received sporadic and unspecialized treatment. The ALJ also stated that plaintiff failed to follow up with a headache specialist. While he noted that plaintiff stated he could not afford treatment without insurance, he also stated that plaintiff received pro bono treatment and his family paid for his medications so he "at least had some access to care." (Tr. 27). The Commissioner also argues that debilitating headaches would receive more frequent and active medical management than a biennial check-in.

Plaintiff stated that a lack of insurance caused him avoid the emergency room for treatment and that he had to learn to deal with his symptoms as a result. (Tr. 43). Plaintiff received pro bono assistance from his doctor so it follows that he did not see his doctor that frequently. He testified that his grandmother paid for his pain medications. The Seventh Circuit has held that in order to properly assess whether someone has the symptoms they allege an ALJ needs to look at the reasoning as to why treatment was avoided. ***McKinzey v. Astrue*, 641 F.3d 884 (7th Cir. 2011).** The Social Security Administration and the Seventh Circuit have stated that an inability to afford treatment is a

15

legitimate reason for not seeking it. SSR 96-7p; **Shauger v. Astrue, 675 F.3d 690 (7th Cir. 2012).** The ALJ here seems to imply that plaintiff could have gotten more treatment if he wanted, and that a lack of insurance was not really a hindrance to his ability to receive care. This is error.

The ALJ then implies that since plaintiff's neurologist did not recommend surgery and plaintiff's MRIs were unchanged from 2008 until 2012 that his headaches were not as severe as he alleged. (Tr. 24). As plaintiff notes, the ALJ did not cite to any evidence that surgery would be appropriate to treat plaintiff's level of Chiari malformation or syringomyelia. Plaintiff testified that his neurosurgeon stated he did not want to operate because plaintiff was not at risk of losing the usage of any limbs or having symptoms severe enough to constitute surgery on his spinal cord and brain. (Tr. 42). This does not mean that plaintiff's doctors felt plaintiff had no symptoms related to his conditions. Chiari malformation is a condition in which brain tissue extends into the spinal canal and has been often associated with severe headaches. **Goins v. Colvin, 764 F.3d 677, 679-81 (7th Cir. 2014)**.

Plaintiff also took strong drugs, like Vicodin, Tramadol, Neuronin, and Flexeril. (Tr. 218, 223, 246, 274). While these drugs alone are not enough to indicate plaintiff's pain was the degree he alleged, the Seventh Circuit has held that it is improbable that "a claimant would undergo pain-treatment procedures such as heavy doses of strong drugs in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if

16

they thought [he] were faking." **Goble v. Astrue, 385 Fed. Appx. 588, 591 (7th Cir. 2010).**

There is no indication that plaintiff should have, or financially could have, received more specialized or aggressive treatment for his disorders. The ALJ improperly assumed that plaintiff's symptoms were not as severe as he alleged because he did not receive a hypothetical treatment that was not suggested and may not have been helpful. The Seventh Circuit has held on several occasions that an ALJ cannot "play doctor" and his decision cannot be based upon his own "independent medical findings." **Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996)**.

Additionally, the ALJ did not state how stable MRIs indicating plaintiff had Chiari malformation would preclude headaches. As plaintiff notes, there is nothing on the record that indicates a change in Chiari malformation would need to be present to determine severe headaches existed. In forming his own medical opinion regarding plaintiff's MRIs, the ALJ again impermissibly "played doctor."

The Commissioner and the ALJ stated that since plaintiff learned to manage his symptoms the degree of pain he alleged is unlikely. (Tr. 26). Plaintiff testified that he "managed" his symptoms by retreating to a dark room and attempting to sleep for hours. (Tr. 43-44). While plaintiff may have stated to a doctor that he could "manage" his symptoms, he also stated that he still had severe daily headaches. (*Ex.* Tr. 219, 221, 231, 274). He did not claim that his headaches were gone or did not bother him. Additionally, as discussed

17

above, plaintiff could not afford frequent treatment and thus it follows that he learned to handle his daily headaches in this manner. This Court agrees with plaintiff that it is unclear how sleeping in a dark room for hours at a time would lead to the ability to maintain work on a consistent basis. The Seventh Circuit has noted that, "a person who cannot work eight hours a day, five days a week, or the equivalent, is disabled." ***Roddy,* 705 F.3d at 636.**

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Janney simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue,* 697 F.3d 642, 646 (7th Cir. 2012), citing *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

Plaintiff's motion for summary judgment is granted. The Commissioner's final decision denying Jacob W. Clendenin application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42**

U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**


DATE:  **June 18, 2015.**


**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**